CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 30 2018

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| TAMMY MAE WERTZ, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil Action No.: 7:18cv00061 |
| | ) |
| LEWIS EDWARD WERTZ, III | ) |
| | ) By: Michael F. Urbanski |
| Respondent. | ) Chief United States District Judge |
| | ) |

## MEMORANDUM OPINION

From Canada, Tammy Mae Wertz petitions the court for return of the parties' minor child to that country, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 et seq. The child, L.E.W., age 8, was removed from Canada on December 20, 2017, without Petitioner's consent, by Respondent Lewis Edward Wertz, III, and has remained in Virginia since that time. Respondent asks the court to deny the petition, arguing L.E.W.'s habitual residence was the United States at the time of removal, Petitioner acquiesced in the removal, and returning L.E.W. to Canada would expose him to grave risk of physical or psychological harm or otherwise place him in an intolerable situation.

The issues presented here are difficult ones, as is true with many Hague Convention cases. This case involves two parents who both deeply care for their child, but who disagree

about what is in his best interest. As a result, this family has been embroiled in custody proceedings in the courts of Canada for many years.

Federal courts are courts of limited jurisdiction, which does not extend to child custody disputes. The Hague Convention and its enacting statutes empower the court to determine the parties' rights under the Convention—not the merits of the underlying child custody claims. 22 U.S.C. § 9001(b)(4). To that end, the court's role is limited to determining whether there has been a wrongful removal, the existence and exercise of custody rights at the time of the removal, and the applicability of any Hague Convention defenses.

These issues have been thoroughly briefed, and the court held a bench trial on March 15–16, 2018, at which the parties appeared in person. The court has carefully considered the evidence presented and the arguments advanced by counsel.

Plainly, Petitioner has met her burden of proving by a preponderance of the evidence that Respondent's removal of L.E.W. to the United States was wrongful within the meaning of the Hague Convention. In defiance of a Canadian court order and Petitioner's custody rights, Respondent wrongfully removed the child from Canada on December 20, 2017. Respondent's unlawful exercise of self-help in removing the child from Canada on the evening before the Canadian court was scheduled to hold a custody hearing compels the court to order return of the child to Canada, where he has habitually resided his entire life.

At the same time, however, the court heard clear and convincing evidence that the child would be subject to a grave risk of harm were he to be returned to Canada without the implementation of certain safeguards, called undertakings, which are necessary to assure the

child's safety. Subject to the undertakings, the court will **CONDITIONALLY GRANT** the Verified Petition.

## I. PROCEDURAL HISTORY

On February 5, 2018, Petitioner filed the instant Verified Petition against Respondent and his father, Lewis Edward Wertz II,[1] along with a request to expedite proceedings and issue a show cause order. The court issued a show cause order on February 9, 2018, requiring the two respondents and the minor child to appear in court on February 15, 2018. At that hearing, Petitioner appeared through counsel; the two respondents appeared pro se and brought L.E.W. with them. Respondents invoked the grave risk exception to the Hague Convention and submitted documentation in support thereof.

Because the well-being of the child was called into question, the court appointed a guardian ad litem for L.E.W., and directed him to conduct an independent investigation into the facts relevant to the Verified Petition and the defenses raised by the respondents. Additionally, given the complexity of this area of the law, the nature of the defenses raised, and the gravity of what is at stake, the court sua sponte appointed counsel for Respondent.[2]

Respondent Lewis Edward Wertz, III, filed a Verified Answer to the Petition. The parties each submitted an affidavit of Canadian law as well as a pretrial brief setting forth in detail the applicable law and their respective positions.

---

[1] Lewis Edward Wertz, II, the minor child's paternal grandfather, was initially a named respondent on account of Petitioner's allegation that he and the child's father engaged in a conspiracy to secretly abduct L.E.W. to the United States. Petitioner alleged that when the child's father left Canada with L.E.W., he delivered L.E.W. to the child's paternal grandfather, who was waiting to receive him on the other side of border. Petitioner subsequently voluntarily dismissed the grandfather as a respondent in this case, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A).

[2] All counsel in this case—Petitioner's counsel, Respondent's counsel, and the guardian ad litem—are providing their services pro bono. The court is grateful for their work and their commitment to the cause of justice.

The guardian ad litem conducted in-person interviews with Respondent, L.E.W., and the child's paternal grandparents. He also interviewed Petitioner via videoconference and Petitioner's 16-year-old daughter J.W. (L.E.W.'s half-sister)—at J.W.'s request and with Petitioner's permission—via telephone. The guardian ad litem interviewed a witness, Wayne Corby, and reviewed court records and orders from Canadian custody proceedings, as well as relevant medical records, school records, and various journal entries. Upon completion of his investigation, the guardian ad litem filed a report and recommendation setting forth his findings.[3] The report was provided to the parties and has been filed on the docket under seal, at the court's direction. The court received it into evidence at the March 15 bench trial.

At trial, the court heard testimony from Petitioner, Petitioner's daughter J.W., Respondent, witness Wayne Corby, and Respondents' two expert witnesses, Apostolos Dallas, M.D., and Jeannie Berger, Ph.D. Based on the testimony elicited at trial, the documentary evidence provided to the court, and the guardian ad litem's report, the court makes the following findings of fact.

## II. FINDINGS OF FACT

Petitioner is a Canadian citizen who currently residents in Niagara Falls, Ontario. She has two daughters from previous relationships. The older was raised by her biological father and lives in Calgary, Alberta. Her younger daughter, J.W., is 16-years-old and lives with a

---

[3] In the course of the guardian ad litem's investigation, he approached the court in camera with concerns over the child's well-being in Virginia. After consulting the United States Attorney and the Federal Bureau of Investigation, the court ordered the guardian ad litem to contact Child Protective Services and the Botetourt County Sheriff's Office and to provide the state authorities with any and all information and documentation, including written journal entries, necessary to assess and ensure the well-being of the child. The court also issued a no-contact order. The information discovered by the guardian ad litem is set forth in his report and recommendation. A representative from the Botetourt County Department of Social Services attended the trial on March 15, and delivered a letter to the guardian ad litem, stating that "it does not appear the actions reported rise to the level of being investigated." The letter recommended the child be referred to counseling. As a result, the court amended the no-contact order and required the recommended counseling.

friend's family near her mother's home in Ontario. This living arrangement was created through an informal agreement, rather than by court order, although J.W. had previously been placed in foster care for brief periods of time. J.W. testified that she sees her mother frequently but the family she lives with is better able to meet her educational and basic needs.

Respondent is a dual citizen of Canada and the United States. Respondent attended high school in Roanoke, Virginia and, after college, spent four and a half years in the military, receiving an honorable discharge. Thereafter, he pursued work as an engineer,[4] and in 2007, his work took him to the Niagara Falls area, where he met Petitioner online.

Petitioner and Respondent were married in Canada on November 3, 2007, but did not live together until June 2008 when they purchased a home in Niagara Falls, Ontario. The parties had one child, L.E.W., born April 3, 2009, who is a dual citizen of Canada and the United States. The family lived together in Ontario while Respondent worked as an engineering professor. Respondent testified this teaching job was conducive to having a young family and allowed him to take an active role in L.E.W.'s life. Over summer vacation, Respondent would take L.E.W. to Virginia for extended visits with family.

But the marriage was troubled, and the parties separated in late 2009. Petitioner left the family home and moved to public housing, where she continues to reside, with J.W. and the infant L.E.W. Respondent remained in the family home. The parties eventually divorced but continued to maintain a sporadic sexual relationship long after their initial separation. This relationship was tumultuous.

---

[4] Respondent was married for a brief period of time following his military service. There were no children born of that relationship.

Both parents developed a close bond with L.E.W. and sought custody of him. Over the span of the ensuing eight years, the Canadian court was asked to resolve custody issues. As early as January, 2010, while the child was still an infant, Family and Children's Services Niagara ("FACS") became involved. The Ontario Office of the Children's Lawyer ("Children's Lawyer") was appointed to represent L.E.W.'s interests in the custody proceedings. Two reports from the Children's Lawyer dated August 9, 2010 and August 15, 2011 have been made part of the record in this case, manifesting the lengthy involvement of Canadian authorities with the parties' domestic and custody issues.

Those reports provide a glimpse into the substance abuse issues that permeate this case. But it was Petitioner's trial testimony that gave the court a full view of Petitioner's prolific use of illegal substances over the course of two decades. Petitioner admitted to using cocaine, crack cocaine, heroin, crystal meth, and marijuana,[5] as well as abusing a staggering list of prescription drugs—Dilaudid, Ritalin, Percocet, OxyContin, Ativan, Adderall, morphine, methadone, diazepam, suboxone, and ketamine—by various means. Petitioner testified she has used drugs while L.E.W. was at school, used cocaine, crystal meth and opiates while L.E.W. was asleep in her home, and smoked marijuana in L.E.W.'s presence.[6] The court is not aware of any Hague Convention cases involving this level of substance abuse, and the enormity of Petitioner's drug abuse, while the child was in the home, overshadows this case.

---

[5] Petitioner testified she now has a medical marijuana prescription but abused the drug without a prescription for more than 20 years.

[6] Petitioner clarified, however, that she did not inject drugs in front of L.E.W., as she had a "no needles" rule while her child was in the house.

Petitioner testified that she completed a 35-day treatment program in 2014 but has relapsed several times over the past two years. As recently as 2017, she admitted to using both cocaine and crystal meth and had numerous positive drug screens. Her trial testimony on this point stands in sharp contrast to the representations she made in her Verified Petition, filed in this court on February 5, 2018, in which she attested she "has been completely free of illicit substances for approximately two years." Verified Pet., ECF No. 1, at ¶ 32; see also id. at ¶ 33. The testimony also is at odds with the account she gave the guardian ad litem, where she stated that she had been drug-free since last summer.

Other aspects of Petitioner's life closely associated with her pervasive drug abuse compound the risk to the child. Arguably the most troubling is Petitioner's relationship with John, a man she knew had been charged with sexual abuse of a child and had a history of domestic abuse of women. Petitioner testified that although she was aware that John had been ordered to have no contact with his own child, she nevertheless began an abusive relationship with him in May 2017, to which her child was exposed. Testimony at trial established that Petitioner appeared at Respondent's house drunk in the middle of the night complaining that John had abused her.[7] Another time, Petitioner testified John threw a cup at her and cut her face. John was arrested, charged, and served 75 days in jail for this abuse. The court is not convinced that the threat posed by the child's exposure to men such as John has passed. Indeed, although Petitioner claims to be done with him, John is no longer in prison and was seen by her on the street.

---

[7] Petitioner's daughter J.W. was present on this occasion.

Although Petitioner admitted that John was present in the home with L.E.W., she insists she never left her son alone with him. Nonetheless, his presence so troubled both a neighbor of Petitioner and a former student of Respondent, that each contacted Respondent to make him aware of the situation. Respondent testified that Petitioner's neighbor, Patty, called him to tell him that John was spending time at Petitioner's house with L.E.W. This was the one and only phone call Respondent ever received from Patty. Patty told Respondent she intended to call FACS to report this information as well. Separately, but around the same time, Respondent's former student Wayne Corby learned that John was dating Petitioner and spending time with L.E.W. Corby used social media to track down Respondent, eventually reaching him through Respondent's aunt. FACS, after being notified of John's contact with L.E.W., wrote a letter to Petitioner dated June 8, 2017, stating:

> Upon review of [John's] contacts with the Society and the potential risk that he poses to yourself and your son, the Society would have grave concerns about your son's safety and wellbeing if [John] was to have any contact with him.
>
> As per our discussion today, on June 8, 2017, this letter is to confirm that you agree that [John] will not have any contact with you if your son is present. If the Society should learn that your son is having contact with [John], we will be required to [take] more intrusive action. . . .
>
> . . .

Resp't Ex. 38, Letter from Patty Krawec to Tammy Wertz (June 8, 2017).

The court's concern that Petitioner's drug-influenced lifestyle poses a risk to L.E.W. was confirmed by her on-and-off romantic relationship with another man, Shawn. Petitioner described Shawn as the "main friend" with whom she used drugs. She testified Shawn has given her crystal meth, heroin, and Dilaudid, and that she has given Shawn her prescription

8

Percocet. Petitioner and Shawn used drugs together in her home while L.E.W. slept. At trial, Petitioner referenced by name a host of others she bought drugs from, sold drugs to, and/or used drugs with—neighbors, friends, and a prostitute she met through Shawn.

In 2011, Petitioner overdosed on Ritalin and suffered a psychotic episode in which she hallucinated and wandered around the common area of her housing complex with a baseball bat, believing there were homeless people in the bushes and dead babies on the ground. Petitioner was hospitalized for two days following this episode, which her daughter J.W. witnessed. L.E.W., who was then just shy of 2, was asleep at the time.

Petitioner has not engaged in legitimate employment in more than a decade.[8] She survives on social assistance and has resorted to illegal means of earning income, such as selling drugs and prostituting herself through an escort agency called Niagara Dolls. Petitioner testified she last worked as a prostitute in 2013. This testimony contradicts a statement she made to the court-appointed guardian ad litem that she had only ever exchanged sex for money with Respondent. Petitioner admitted on direct examination that she was not truthful about this fact in her interview with the guardian ad litem.[9]

Petitioner frequently asked Respondent for money, long after the parties divorced. At times, money was given in exchange for sexual favors. Other times, Petitioner requested, and Respondent paid, money so that she could afford bus fare to the suboxone clinic or to buy L.E.W. lunch at school. As recently as December 2017, Petitioner emailed Respondent stating she needed $100 that day, or she would be forced to pawn her cell phone or sell her

---

[8] Petitioner testified she is currently making jewelry out of her home but has only made $20 from her jewelry sales to date.

[9] This was not the only falsehood told to the guardian ad litem. His report reflects Petitioner told him she had not used drugs since June 2017, had no individual connected to drugs at her home, and had not delivered drugs for others. Petitioner's trial testimony contradicted these statements.

belongings online. Respondent gave her $100. At trial, Petitioner testified that it was possible that she used that money to buy drugs.

Other incidents of Petitioner's addiction adversely impacted the child. Importantly, school records from 2016–17 reveal L.E.W. was absent 21 and a half days and tardy 56 days while he was in Petitioner's care. Petitioner admitted leaving L.E.W. alone, unsupervised, with men who lived in her housing complex—one of which is known to Petitioner only by first name. Further, in 2016, she assaulted Respondent in front of L.E.W. While in the car on the way to her suboxone treatment, she punched Respondent and split his lip open.

Petitioner claims to have "changed drastically" since then. To her credit, she has sought counseling and has been undergoing suboxone treatment in an effort to get her substance abuse under control and make better choices. She has had multiple "restarts" at the clinic after missing her treatment, and has testified to a number of recent relapses, which Dr. Dallas testified is to be expected given the nature of this insidious disease. Drug screens from the past few months of 2018 have been clean, and she claims to be resolute in her desire to live a drug-free life. Yet her self-described support system includes a friend with whom Petitioner currently smokes marijuana and from whom she has illegally purchased suboxone. Also of concern is Petitioner's testimony that she is confident in her ability to stay clean because the "main friend" she did drugs with—Shawn—is currently incarcerated. All of this, along with her admitted false statements and long history of drug abuse, leads the court to find Petitioner's claim that she is capable of assuring the safety of the child utterly incredible.

The parties' domestic issues are not all one-sided. Although Respondent denies ever physically abusing Petitioner, he admitted to confining her in a room on one occasion when L.E.W. was approximately six months old. This incident allegedly arose out of Petitioner's use of marijuana in the child's presence. Petitioner called the police and subsequently, without warning, moved out of Respondent's house and into government housing, taking J.W. and L.E.W. with her. Respondent testified that for over a year, no one would tell him where Petitioner and his son were living. This marked the beginning of a long, hotly contested custody dispute between the parties in the Canadian courts.

L.E.W. resided primarily with Petitioner until her psychotic episode in January 2011, after which L.E.W. was placed in Respondent's care temporarily. Petitioner's access to her son was initially supervised in the months following her hospitalization but eventually included unsupervised visits at her home. An August 2011 report by the Children's Lawyer recommended Respondent have full custody of the child but found Petitioner should have unsupervised access. The report further recommended neither party shall relocate outside a 30 kilometer radius of Niagara Falls or take the child out of Ontario for any reason without first obtaining court permission.

On September 26, 2012, the Canadian court entered a final order giving both parties joint custody of L.E.W., but setting his primary residence with Respondent and secondary residence with Petitioner. The order provided Petitioner access to L.E.W. every Monday and Wednesday from 9:00 a.m. to 6:00 p.m. and every Friday from 9:00 a.m. to Saturday at 12:00 p.m. or Saturday at 10:00 a.m. until Sunday at 12:00 p.m. The order provided that Respondent shall make important decisions about the child's welfare after consulting with

Petitioner, but placed ultimate decision-making authority with Respondent to the extent the parties could not agree.

On June 20, 2017, after FACS became aware of Petitioner's relationship with John and directed that L.E.W. have no contact with him, FACS sent Respondent a letter, stating:

> This is to advise you that Family and Children's Services Niagara has concluded the child protection matter referred to us on June 12, 2017. The allegations were verified; however, as [L.E.W.] is in the care of you, his custodial parent, there are no current protection concerns and the file will close. As we have discussed, please ensure that [L.E.W.] is not exposed to people who may pose a risk to him while visiting his mother.

Resp't Ex. 38, Letter from Patty Krawec to Ted Wertz (June 20, 2017). For Respondent, who had witnessed what he described as Petitioner's "slow degradation" over the preceding two years, the exposure of L.E.W. to the danger posed by John was the final straw. Believing the Canadian court had vested in him final decision-making authority as the primary custodial parent, Respondent determined to move L.E.W. to Virginia and informed FACS of this fact at a meeting on June 9, 2017. Respondent read FACS's June 20 letter as vesting in him sole responsibility for the well-being of his son.

The record documents Respondent's numerous unsuccessful attempts to contact Petitioner in June and inform her of his intentions to move to Virginia by end of summer 2017, so that L.E.W. could begin third grade in Roanoke in the fall. For her part, Petitioner claims to have first learned that Respondent took L.E.W. and relocated to Virginia by email from Respondent dated July 7, 2017. She filed a contempt petition against Respondent in the Canadian court in July, but Respondent was never served with this petition for reasons unclear to the court. L.E.W. began third grade in Virginia.

Petitioner hatched a plan to get L.E.W. back up to Canada and convinced Respondent to bring him to Ontario in November for J.W.'s birthday party. During that visitation, Petitioner took L.E.W. to a women's shelter so she could maintain custody over him until a hearing could be scheduled in the Canadian court. The parties entered into a joint custody agreement on November 22, 2017, which was memorialized in a temporary order by the Canadian court bearing the same date but signed December 21, 2017. That order provides that L.E.W. shall reside with Petitioner from Sunday at 8:00 a.m. through Wednesday at 7:00 p.m. and shall reside with Respondent from Wednesday at 7:00 p.m. through Sunday at 8:00 a.m. each week. The court ordered Respondent to deliver L.E.W.'s birth certificate and passport to his attorney to be held pending further order of the court, and required Respondent to give Petitioner 15 days notice of any change of address from his Niagara Falls residence. The order further stated that L.E.W. was to be enrolled at Kate S. Durdan Public School, and that his place of residence was deemed the Niagara Region. The court ordered a FACS report to be prepared within 30 days. The balance of the September 26, 2012 final custody order remained in full force and effect. A final custody hearing was scheduled for December 21, 2017.

On December 20, 2017, Canadian law enforcement informed Petitioner that Respondent had crossed the Canadian border into the United States with L.E.W., after picking the child up for court-ordered physical custody time that evening. Respondent did not appear at a scheduled custody hearing in the Canadian court the following day and sent Petitioner a text message saying simply: You lose. Petitioner worked with legal aid attorneys to secure American counsel. The instant Verified Petition followed.

The court received reports and heard testimony from two expert witnesses at the March 15-16, 2018 trial of this matter. Apostolos Dallas, M.D., an internal medicine physician, testified as to the effects of drug abuse on individuals. In relevant part, he opined that Petitioner was likely to relapse again, based on her history of significant drug use and the insidious nature of this disease. Jeannie Berger, Ph.D., a clinical psychologist, described Petitioner's "phenomenal" substance abuse and noted records indicate a trajectory of increased drug use from 2014 to 2017, which poses a great risk to L.E.W. [10]

## III. CONCLUSIONS OF LAW

Petitioner asks this court to return her child, L.E.W., to Canada pursuant to the Hague Convention. Respondent argues that Petitioner has not established a prima facie case because L.E.W.'s habitual residence was the United States at the time of the removal. He also raises the affirmative defenses that Petitioner acquiesced to L.E.W.'s removal from Canada, and that L.E.W. would be subject to a grave risk of physical or psychological harm if returned to Canada.

### A. Legal Framework

The Hague Convention was drafted to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, preamble. In furtherance of that mission, the Hague Convention establishes legal rights and procedures for the prompt return of children who have been "wrongfully removed to or retained in" a nation that is a party to the Hague Convention. See Hague Convention, art. 1.

---

[10] Dr. Dallas and Dr. Berger rendered their opinions based on their review of the records in this case. Dr. Berger also attended much of the trial.

The Hague Convention applies to children under the age of 16 who were habitually resident in a state that is a party to the convention immediately prior to their wrongful removal or retention. See Hague Convention, art. 4. Both the United States and Canada are signatories to the Hague Convention. The United States has implemented the Hague Convention through the International Child Abduction Remedies Act ("ICARA"). See 22 U.S.C. §§ 9001, et seq.

United States courts have concurrent original jurisdiction in actions arising under the Hague Convention. See 22 U.S.C. § 9003(a). "The Convention and [ICARA] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4). Accordingly, the court's inquiry is not what is in the best interests of the child as is typically the case in a child custody matter. See Hazbun Escaf v. Rodriquez, 200 F. Supp. 2d 603, 610–11 (E.D. Va. 2002), aff'd sub nom. Escaf v. Rodriguez, 52 F. App'x 207 (4th Cir. 2002). Importantly, the Hague Convention's return remedy does not alter the pre-existing allocation of custody rights between parents; the Convention generally leaves ultimate custodial decisions to the court of the country of habitual residence. See Abbott v. Abbott, 560 U.S. 1, 8 (2010).

## B. Prima Facie Case

To present a prima facie case under ICARA, a petitioner must prove by a preponderance of the evidence that the child has been wrongfully removed or retained within the meaning of the Hague Convention. See 22 U.S.C. § 9003(e)(1)(A). Under the Hague Convention, a removal or retention is considered "wrongful" where:

> a)  it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone,

> under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b)  at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for removal or retention.

Hague Convention, art. 3. Therefore, in order to establish a prima facie case of wrongful removal or wrongful retention under the Hague Convention and ICARA, Petitioner must establish by a preponderance of the evidence that: (1) L.E.W. was habitually resident in Canada at the time of his removal by Respondent; (2) Respondent's removal of L.E.W. breached Petitioner's custody rights under the laws of Canada; and (3) Petitioner was exercising her custody rights at the time of the removal. See Hague Convention, art. 3; Abbott, 560 U.S. at 8; Maxwell v. Maxwell, 588 F.3d 245, 251 (4th Cir. 2009); Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001).

## 1. Habitual Residence

"Habitual residence" is not defined in the Hague Convention. See Miller, 240 F.3d at 400. However, "there is no real distinction between ordinary residence and habitual residence." Id. (internal citation omitted). Determining the child's habitual residence before the alleged wrongful removal is a fact-specific inquiry, judged on a case-by-case basis. Id.

Courts within the Fourth Circuit conduct the habitual residence analysis guided by a two-part framework. See Maxwell, 588 F.3d at 251. The court first examines whether the parents shared a settled intention for L.E.W. to abandon the former country of residence. Id. (citing Mozes v. Mozes, 239 F.3d 1067, 1075 (9th Cir. 2001)). Shared parental intent is determined from all of the evidence presented, not merely on the representations of

the parties. Id. at 252. In cases "'where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period,' courts have refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." Id. (quoting Mozes, 239 F.3d at 1071).

The court next analyzes the "extent of the child's acclimatization to the new country of residence." Id. at 253. The extent of the child's acclimatization is not merely a question of "whether the child's life in the new country shows some minimal degree of settled purpose, but whether the child's relative attachments to the countries have changed to the point where [ordering the child's return] would now be tantamount to taking the child out of the family and social environment in which its life has developed." Id. at 253–54 (internal quotations and citations omitted).

Petitioner has established that the parents did not share a settled intention for L.E.W. to abandon Canada and move to the United States in December 2017. Although the parties entered into a number of custody orders during the course of L.E.W.'s life, Petitioner and Respondent both agreed to and signed a temporary custody order on November 22, 2017 setting L.E.W.'s place of residence as "the Niagara Region." The order further required Respondent to disclose in advance any plans to move from his Niagara Falls, Ontario home, required L.E.W. to be registered at a Canadian school, and obligated Respondent to deliver L.E.W.'s birth certificate and passport to his attorney to be held pending further order of the court. See Resp't Ex. 2, Temporary Order of Ontario Superior Court of Justice, Nov. 22, 2017.

During cross-examination, Respondent further admitted that the Canadian court forbade him from removing L.E.W. from the country at the November 22, 2017 hearing. Respondent justified ignoring the Canadian court's order because he believed that he signed the custody agreement under duress, he had not read the entire agreement, and he thought that the Canadian court had not considered his position fully. The court does not find this argument to be persuasive. While custody disputes are undeniably stressful—particularly given the factual circumstances presented here—Respondent was not forced to sign the agreement and had the advice of counsel (even if he was unsatisfied with counsel's services) in determining whether to come to an agreement. Moreover, Respondent sought the court's permission to relocate L.E.W. to the United States in December 2017, which implicitly acknowledges L.E.W.'s residence in Canada. See Resp't Ex. 6, Case Conference Brief of the Respondent. Petitioner and Respondent did not share a settled intention for L.E.W. to abandon Canada.

Respondent argues that the court should ignore the November 2017 temporary custody order because L.E.W.'s habitual residence changed when Respondent retained him in Virginia from June to November of last year. The court disagrees. Habitual residence did not change from Canada during this time period because the parents did not share a settled intent for L.E.W. to permanently move to Virginia. Petitioner testified that she only agreed to a visit, and her filing of a contempt petition against Respondent for retaining L.E.W. longer than intended supports her position. See infra § III.C (regarding Respondent's acquiescence defense). This lack of shared settled intent is bolstered by the parties'

agreement in November to have L.E.W. reside in the Niagara Region.[11] As the June to November retention did not change L.E.W.'s place of habitual residence, Canada was the place of habitual residence throughout the relevant time period.

Moreover, the extent of L.E.W.'s acclimatization to the United States does not alter the court's finding that habitual residence has been established in Canada. Respondent presented evidence of L.E.W.'s enrollment in school, participation in youth basketball, and involvement in church programs in Virginia. See, e.g., Resp't Ex. 12, Botetourt County Public Schools Progress Report 2017–18; Resp't Ex. 13, Email from Cloverdale Elementary School basketball coach, Nov. 15, 2017; Resp't Ex. 41, Letter from Faith Alliance Church, Nov. 15, 2017. However, the court finds that L.E.W.'s recent three-month stay, and even his prior stay from June to November 2017, in the United States does not establish that he was acclimatized to his new environment such that returning him at this point "would now be tantamount to taking the child out of the family and social environment in which its life has developed." Maxwell, 588 F.3d at 253–54 (quoting Mozes, 239 F.3d at 1081).

The court further credits the guardian ad litem's findings to the extent they speak to L.E.W.'s acclimatization. In the guardian ad litem's interview, L.E.W. "talked about his time in Virginia during the summers but he talked as though he was only here for a couple of weeks at a time. When asked where he would like to live, [L.E.W.] noted that he would like to live with his mother and his father." R&R of Guardian Ad Litem, ECF No. 44, at 18.

[11] To the extent Respondent argues that the November 2017 order is not determinative of habitual residence similar to Nicolson v. Pappalardo, 605 F.3d 100 (1st Cir. 2010), the court is not persuaded because Nicolson is factually distinguishable. In Nicolson, the court rejected the respondent's acquiescence defense based on the petitioner's consent to a protection from abuse order that awarded temporary custody to the respondent. The court explained, "the order is, on the point in question, a cryptic collection of printed and handwritten phrases that yields no single answer as to who is to decide on permanent custody." Id. at 107. Unlike Nicolson, the November 2017 order clearly provides for joint custody, with the child residing with Petitioner from Sunday until Wednesday and with Respondent from Wednesday until Sunday on a temporary basis until the hearing set for December 21, 2017.

L.E.W. has family beyond his parents in both Canada and the United States, and he has now attended school in both countries. Moreover, based on Respondent's own testimony, L.E.W. has been accustomed to visiting for weeks to months at a time over summer vacations in the United States with an ultimate return to Canada. L.E.W.'s relative attachment to the United States versus Canada has not changed to the point where returning L.E.W. would be "tantamount to taking the child out of the family and social environment in which its life has developed." Maxwell, 588 F.3d at 253–254.

Therefore, the court finds that L.E.W. is habitually resident in Canada.

## 2. Breach of Custody Rights

The removal of the child also must be a breach of the petitioner's custodial rights. Under the Hague Convention, "rights of custody ... may arise in particular operation of law or by reason of an administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention, art. 3. The Hague Convention defines custody rights as the "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a).[12] The analysis is based on the custody status at the time of the alleged wrongful removal. See Hague Convention, art. 3; White v. White, 718 F.3d 300, 307 (4th Cir. 2013); Miller, 240 F.3d at 401.

---

[12] "[T]he Hague Convention distinguishes between 'rights of custody'—which are necessary to support a claim of wrongful removal—and mere 'rights of access.'" Bader v. Kramer, 445 F.3d 346, 349 (4th Cir. 2006). Article 5(a) of the Hague Convention provides that "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Article 5(b) of the Hague Convention provides that "'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence." The Supreme Court has clarified that a ne exeat right—"the authority to consent before the other parent make take the child to another country"—is a "right of custody" under the Hague Convention. Abbott, 560 U.S. at 5, 10.

The parties agree that Canadian law governs Petitioner's custody rights and whether Respondent breached those rights by removing L.E.W. See Pet'r's Aff. of Canadian Law, ECF No. 29; Pet'r's Suppl. Aff. of Canadian Law, ECF No. 31; Resp't's Aff. of Canadian Law, ECF No. 42.[13] In Ontario, the Children's Law Reform Act governs child custody matters. See Children's Law Reform Act, R.S.O. 1990 c.12 (Can.). Section 21 of the Act provides that "[a] parent of a child . . . may apply to a court for an order respecting custody of or access to the child or determining any aspect of the incidents of custody of the child." The court "may grant the custody of or access to the child to one or more persons[,] . . . determine any aspect of the incidents of the right to custody or access[,] . . . and . . . make such additional order as the court considers necessary and proper in the circumstances." Id. § 28(1).

At the time of L.E.W.'s removal on the night of December 20, 2017, there were two operative custody orders entered by Canadian courts: a September 26, 2012 final custody order, see Resp't Ex. 1, and a November 22, 2017 temporary custody order varying Paragraph 4 of the 2012 order, see Resp't Ex. 2. The September 2012 final custody order established "joint custody" over L.E.W. with primary residence at the Respondent's home and secondary residence at the Petitioner's home. See Resp't Ex. 1. Respondent had the authority to make important decisions about L.E.W.'s welfare after consulting with Petitioner, but had "the right to make the final decision on any issue" in the event the parties could not agree. See Resp't Ex. 1.

---

[13] The court took notice of all three affidavits of Canadian law for consideration at the evidentiary hearing held on March 15, 2018.

The parties dispute whether this September 2012 final custody order amounts to joint custody for purposes of the Hague Convention. Under Canadian law, "[t]he term 'joint custody' is used to describe situations where both parents are given full decision-making authority and responsibility in all areas respecting the child, and must make those decisions together." Jackson v. Jackson, [2017] O.N.S.C. 1566, para. 63. Petitioner's expert opined that Respondent's "tie-breaking authority on decisions about the 'child's welfare' contained in the Canadian Court's [2012 Order] does not include unilateral decision making on relocation of the child from Ontario, Canada." See Pet'r's Aff. of Canadian Law, ECF No. 29. The expert further noted that the order gave Petitioner access to L.E.W. at certain times and set L.E.W.'s secondary residence with Petitioner. See id. By contrast, Respondent's expert attests that the order is not for joint custody, but actually sole custody, because Respondent had ultimate decision-making authority. See Resp't's Aff. of Canadian Law, ECF No. 42.

While the court is not persuaded by Respondent's "joint custody" means "sole custody" argument, the November 2017 temporary custody order renders that debate irrelevant as it governed the custody rights of the parties at the time of L.E.W.'s removal. The court did not sign the November 2017 temporary custody order until December 21, 2017, but the face of the order dates its entry as November 22, 2017. See Resp't Ex. 2. Petitioner's Supplemental Affidavit of Canadian Law states that the order's effective date is the date of the court order on November 22, rather than the signature date on December 21. See ECF No. 31.

Regardless of the entry date, the order memorializes the parties' agreed-to custody arrangement that was signed and attached to the November 2017 temporary custody order.

In that agreement, Petitioner and Respondent agreed to what was effectively joint custody: L.E.W. was to reside with Petitioner from Sunday at 8:00 a.m. until Wednesday at 7:00 p.m. each week, and reside with Respondent from Wednesday at 8:00 p.m. until Sunday at 8:00 a.m. each week. See Resp't Ex. 2.[14] Petitioner's custody rights under the Hague Convention flow from that November 22, 2017 agreement. See Hague Convention, art. 3 ("The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.").

Respondent clearly breached Petitioner's custody right to reside with L.E.W. from Sunday morning through Wednesday evening in Canada when he removed L.E.W. to reside in Virginia. By requiring Respondent to turn over L.E.W.'s birth certificate and passport and provide notice of any changes to his place of residence in Ontario, the Canadian court granted Petitioner a ne exeat right, or the right to decide L.E.W.'s country of residence. As held by the U.S. Supreme Court in Abbott v. Abbott, 560 U.S. at 9, a ne exeat right is a right of custody under the Hague Convention. As Petitioner did not give Respondent permission to remove L.E.W. from Canada, her custody rights were breached.

Petitioner therefore has rights of custody under the Hague Convention and those rights were breached by Respondent's removal of L.E.W.

### 3. Exercise of Custody Rights

The final prong of a Hague Convention prima facie case requires Petitioner to demonstrate that she was exercising her custody rights at the time Respondent removed

---

[14] Respondent's submitted exhibit for the November 22, 2017 temporary order only included the court's typed order. The court takes notice of the attached agreement signed by the parties, referenced as the "minutes of settlement filed" in the court's order, which has been filed with Petitioner's Affidavit of Canadian law. ECF No. 29, Ex. 5.

L.E.W. to the United States. In the context of custody, the term "exercise" is liberally construed and will be found "'whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.'" Bader, 484 F.3d at 671 (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1065 (6th Cir. 1996) ("Friedrich II")). "Under this approach, 'a person [who] has valid custody rights to a child under the law of the country of the child's habitual residence . . . cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.'" Id. at 671 (citing Friedrich II, 78 F.3d at 1066).

While the parties dispute whether Petitioner acquiesced to L.E.W.'s removal from June to November 2017, there is no dispute that Petitioner exercised her custody rights during the period following the November 2017 temporary custody order.[15] To be sure, Petitioner schemed to persuade Respondent to return with L.E.W. to Canada in November 2017 for a birthday party, all the while planning to take custody of L.E.W. This episode led to the agreement and November 22, 2017 temporary order, under which Petitioner exercised custody rights until Respondent removed L.E.W. from Canada on December 20, the night before their custody hearing. As such, Petitioner was exercising her custody rights at the time Respondent removed L.E.W. to the United States.

Accordingly, the court finds that Canada was L.E.W.'s place of habitual residence, Petitioner had custody of L.E.W. as defined in the Hague Convention and under the laws of Canada, and Petitioner was exercising her custody rights prior to L.E.W.'s removal to the United States in December 2017. Therefore, the court concludes that Petitioner has met her

---

[15] Even preceding the November temporary order, Petitioner filed (albeit never served) a contempt motion against Respondent for removal of L.E.W. in July 2017, which was an attempt to exercise custody rights. See Pet'r's Ex. 5, Aff. in Support of Contempt Mot.

burden of proving by a preponderance of the evidence that Respondent's removal of the child to the United States was wrongful within the meaning of the Hague Convention.

## C. Hague Convention Defenses

Upon a showing of wrongful removal or retention, the return of the child is required unless a respondent establishes one of the defenses available under the Hague Convention. See Hague Convention, arts. 12, 13, & 20. Even if Respondent proves that one of the exceptions applies, the court retains the discretion to order a child's return. Hague Convention, art. 18; Miller, 240 F.3d at 398. Respondent in this case has raised two of the Hague Convention's exceptions: the "acquiescence" exception pursuant to Article 13(a) and the "grave risk" exception pursuant to Article 13(b).

### 1. Acquiescence

Respondent contends that Petitioner acquiesced to L.E.W.'s removal to the United States when Respondent retained L.E.W. in Virginia from June to November 2017.[16] Under the Hague Convention, the court "is not bound to order the return of the child" if the petitioning parent "subsequently acquiesced in the removal or retention" of the child. Hague Convention, art. 13(a). This defense requires the acquiescing parent to have "subsequently agreed to or accepted the removal or retention." Padilla v. Troxell, 850 F.3d 168, 175 (4th Cir. 2017) (citing Darin v. Olivero-Huffman, 746 F.3d 1, 14 (1st Cir. 2014); Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005); Gonzalez-Caballero v. Mena, 251 F.3d 789, 794 (9th Cir. 2001)). Acquiescence generally requires "more formality" than consent, based on "evidence such as testimony in a judicial proceeding, a convincing renunciation of rights, or a

---

[16] Respondent conceded at the evidentiary hearing that Petitioner did not consent to L.E.W.'s removal, focusing instead on acquiescence.

consistent attitude over a significant period of time." Id. at 175–76 (citing Darin, 746 F.3d at 16; Baxter, 423 F.3d at 371). However, for situations where the court has to assess inferred acquiescence, courts look to the subjective intent of the allegedly acquiescing parent. See Darin, 746 F.3d at 16 (citing Nicolson v. Pappalardo, 605 F.3d 100, 107 (1st Cir. 2010); Baxter, 423 F.3d at 371). Respondent bears the burden of establishing acquiescence by a preponderance of the evidence. See 22 U.S.C. § 9003(e)(2)(B).

Because the defense of acquiescence pertains only to post-retention actions, the relevant period for consideration is from June 2017 to the filing of the petition. See Darin, 746 F.3d at 16–19. After Petitioner learned that Respondent did not intend to return L.E.W. from his summer vacation in Virginia, she filed a contempt petition against Respondent with the Canadian court in July 2017. See Pet'r's Ex. 5, Aff. in Support of Contempt Mot. The contempt petition was never served on Respondent by the process server for reasons unclear to the court.[17] However, both parties testified at the evidentiary hearing that Petitioner hatched a plan to regain custody over L.E.W. by convincing Respondent to bring the child to Canada in November 2017. Petitioner then brought L.E.W. to a women's shelter in Canada so as to maintain custody over him until a custody hearing before the Canadian court. Petitioner maintained joint custody over L.E.W. until his wrongful removal in December, and then promptly filed a petition for return under the Hague Convention.

Acquiescence need not be as formal as an official renunciation, but there must be some evidence of an agreement to or acceptance of the retention. Filing for contempt, scheming to regain custody, bringing L.E.W. to a women's shelter pending a Canadian

---

[17] Both parties alleged attempts to submit documentation to the other stating their intentions for custody, while both stated they had not received such documentation. The court does not find either party credible regarding the delivery of these communications as they both acknowledged seeing each other in person multiple times over the summer of 2017.

custody hearing, and filing a Hague petition does not demonstrate Petitioner's acceptance of L.E.W.'s move to Virginia. To the extent Respondent relies on any delay in Petitioner's attempts to regain custody of L.E.W. in the summer and fall of 2017, the court finds no merit to the argument. Petitioner took steps to seek relief from the Canadian courts through the contempt petition, and ultimately convinced Respondent to return L.E.W. within months of his removal. See Darin, 746 F.3d at 18–19 (finding that filing Hague Petition after five months does not constitute such a delay as to be suggestive of acquiescence, particularly where petitioner was considering alternative remedies).

Respondent has not established by a preponderance of the evidence that Petitioner acquiesced to the removal of L.E.W. to Virginia during the summer and fall of 2017.

### 2. Grave Risk

Respondent primarily defends his wrongful removal by arguing that L.E.W. would be subject to grave risk in Petitioner's care in Canada. Under the grave risk exception, a respondent must establish that there is "a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). "Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." 51 Fed. Reg. 10510 (1986). The grave risk exception is narrowly interpreted, and the standard for establishing the existence of a grave risk of harm is high. See Miller, 240 F.3d at 402. Respondent must prove the allegation of grave risk by clear and convincing evidence in order to establish the exception. See ICARA, 22 U.S.C. § 9003(e)(2)(B).

There is no clear definition of what constitutes grave risk. See Luis Ischiu v. Gomez Garcia, 274 F. Supp. 3d 339, 350 (D. Md. 2017) (citing Friedrich II, 78 F.3d at 1068). Some courts have held that demonstrating grave risk requires a showing that the child would be returned to an environment in which the child would experience war, famine or disease, or that there exists the serious threat of abuse where the court in the country of habitual residence could not protect the child. See Friedrich II, 78 F.3d at 1060. Other cases have held that a respondent must establish by clear and convincing evidence a pattern of sexual or physical abuse of child or parent in order to invoke the Article 13(b) grave risk exception. See e.g., Danaipour v. McLarey, 386 F.3d 289 (1st Cir. 2004). While an unwieldy standard, courts agree that the risk to the child must be more than "merely serious," see Luis Ischiu, 274 F. Supp. 3d. at 350 (citing Friedrich II, 78 F.3d at 1068), and the defense "may not be used as a vehicle to litigate (or relitigate) the child's best interests." Danaipour, 286 F.3d at 14 (1st Cir. 2002) (quoting Hague International Child Abduction Convention: Text and Legal Analysis, 51 FR. 10,494, 10,510 (Dep't of State Mar. 26, 1986)); see also Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000) ("The text of the article requires only that the harm be 'physical or psychological,' but context makes it clear that the harm must be a great deal more than minimal.").

Here, Respondent argues that Petitioner's phenomenal drug abuse, and all of the risky behavior that emanates from that abuse, establishes a grave risk that L.E.W.'s return would expose him to physical or psychological harm or otherwise place him in an intolerable situation. Respondent makes a compelling argument that Petitioner has built her life around drug abuse, the consequences of which are dire.

"Drug use, under certain circumstances, . . . may qualify as grave-risk conduct."
Mlynarski v. Pawezka, 931 F. Supp. 2d 277, 284 (D. Mass. 2013), aff'd, No. 13-1361, 2013
WL 7899192 (1st Cir. May 8, 2013) (finding no grave risk where petitioner had
"susceptibility to taking psychoactive substances" and occasionally smoked marijuana).
Courts use a two-step approach to determine whether allegations of drug use qualify as a
grave risk. "[T]he court must first determine whether the alleged . . . drug use in fact
occurred. Beyond that, the court must consider as part of the grave risk analysis how such
conduct, if confirmed, would affect the child were he to be returned to his habitual
residence." Id. at 284–85 (internal citation omitted). There is no case law to help guide the
court in assessing grave risk for the level of drug use presented here. The court is not aware
of, and the parties have not pointed to, any cases involving the sheer enormity of the drug
abuse evidenced in this case. There also is no case law addressing the facts presented here,
where it is obvious that Petitioner's rampant drug abuse—with the child present in the
home—threatens the physical and psychological well-being of the child.

To be sure, courts have found that past drug abuse, standing alone, is insufficient to
constitute a grave risk. See Taylor v. Hunt, No. 4:12CV530, 2013 WL 620934, at *8 (E.D.
Tex. Jan. 11, 2013), report and recommendation adopted, No. 4:12CV530, 2013 WL 617058
(E.D. Tex. Feb. 19, 2013) (citing Sanchez v. Sanchez, 2012 WL 5373461, at 3 (W.D. Tex.
2012)) ("Evidence of past acts of domestic abuse or past drug activity in the place of habitual
residence is not enough for the grave risk exception to apply."); see also Norinder v.
Fuentes, 657 F.3d 526, 535 (7th Cir. 2011) ("[W]hatever drinking and drug problems have
existed do not affect the outcome here.").

Likewise, courts have declined to find grave risk where the past drug abuse occurred outside the presence of the child, or where relationships that posed the risk of drug abuse have been abandoned. See Sanchez v. R.G.L., 761 F.3d 495, 500, 509 (5th Cir. 2014) (finding no gave risk where mother ended relationship with boyfriend who abused and trafficked drugs); In re Hague Application, No. 4:07CV1125SNL, 2007 WL 4593502, at *10–11 (E.D. Mo. Dec. 28, 2007) (rejecting grave risk defense where petitioner maintained drug-free home and terminated marijuana use, and where prior drug use was not in home or children's presence).

But the limiting factors present in those cases are not present here, where the evidence establishes that Petitioner's unrelenting addiction transcends every other aspect of her life, without regard to the consequences to her child. The petitioner in this case has a staggering history of drug abuse. Petitioner testified to using cocaine, heroin, crystal meth, marijuana, Ritalin, morphine, OxyContin, and Percocet. She admitted using crystal meth and Dilaudid in her home while L.E.W. slept, and to selling drugs—namely Ritalin and marijuana—on the street. Drug screens from the past two years include positive results for a variety of illegal substances, including cocaine, morphine, OxyContin, benzodiazepine, methadone, amphetamine, ketamine, and methamphetamine. Despite alleging falsely in her Verified Petition that she has been free of illicit substances for the last two years, she has relapsed numerous times. Indeed, Petitioner testified to a relapse in July 2017 and had positive drug screens as recently as December 2017 and January 2018. Petitioner's testimony suggests that she purchased drugs as recently as December 2017.

Petitioner, to her credit, has sought treatment for her drug abuse, and her drug screens for the past couple of months of 2018 suggest improvement. But Petitioner has had multiple "restarts" due to missing treatments, and reported to her doctor in January 2018 that she had purchased unprescribed suboxone off the street. Given the admitted falsehoods in prior statements made in connection with this litigation, the court is unable to credit Petitioner's testimony that her drug abuse days are over.

The court is deeply concerned about the effect of this decades-long drug abuse on L.E.W. The severity of Petitioner's drug use and the effects it has had on L.E.W. are unlike anything the court has come across in other Hague Convention cases. The evidence documents the substantial likelihood of ongoing substance abuse. Respondent's expert, Dr. Dallas, testified that a relapse would expose L.E.W. to psychological and physical harm. Dr. Berger opined that L.E.W. was at grave risk of psychological harm from Petitioner's pattern of using drugs in her home while L.E.W. slept upstairs or was at school. Petitioner's drug use clearly has an effect on L.E.W., as he missed more than 20 days of school during the 2016–17 academic year and was tardy 56 times.

Petitioner's continuous pull to drugs further has led her to engage in perilous personal conduct, including prostitution and exposing her children to men with dangerous criminal pasts. Although she claims to have abandoned this lifestyle several years ago, Respondent's witness Wayne Corby testified that Petitioner worked as an escort as recently as May or June 2017. Dr. Dallas testified that prostitution regularly is associated with drug abuse, and the court cannot ignore the possibility that Petitioner may return to prostitution as a means of supporting her drug habit. Petitioner's drug abuse also has caused her to

expose L.E.W. to dangerous people, as evidenced by the June 2017 letter from FACS mandating no contact with John.

It is clear to the court that Petitioner deeply cares about her son. But the court cannot ignore the clear and convincing evidence that Petitioner's drug abuse, and all of the consequences thereof, constitute a grave risk that L.E.W.'s unconditional return to her custody in Canada would expose him to physical or psychological harm or otherwise place him in an intolerable situation. See Hague Convention, art. 13(b).

## IV. UNDERTAKINGS

Here, the longstanding involvement of the Canadian court system and child service agencies in the lives of this family cries out for return of this child to their jurisdiction and care. Equally important is the fact that Respondent, under court order not to remove the child from Ontario, slipped him across the border in the dead of night a few hours before the Canadian court was to revisit custody issues. Decisions on the custody of this child belong before the Ontario court and child service agencies. The Hague Convention and ICARA do not allow Respondent to abscond with this child to the United States in an effort to wrest jurisdiction from Canadian authorities. As such, the court will order the child to be returned to Canada.

Where there is a finding of grave risk, courts are "not bound to order the return of the child," Hague Convention art. 13(b), but may do so if sufficient protection is afforded. See Simcox, 511 F.3d at 605. To mitigate the risk, courts may impose a set of enforceable conditions on the return, known as undertakings. Imposing undertakings "allows courts to conduct an evaluation of the placement options and legal safeguards in the country of

habitual residence to preserve the child's safety while the courts of that country have the opportunity to determine custody of the children within the physical boundaries of their jurisdiction." Luis Ischiu, 274 F. Supp. 3d at 354–55 (quoting Walsh, 221 F.3d at 219). Such undertakings should be "'limited in scope and further the Convention's goal of ensuring the prompt return of the child to the jurisdiction of habitual residence, so that the jurisdiction can resolve the custody dispute.'" Baran, 526 F.3d at 1350 (quoting Danaipour, 286 F.3d at 22). The undertakings also may "accommodate [both] the interest in the child's welfare [and] the interests of the country of the child's habitual residence." Van De Sande v. Van De Sande, 431 F.3d 567, 571–72 (7th Cir. 2005).

This case is ripe for undertakings. Although the court has found that L.E.W. faces a grave risk if returned, this risk can be mitigated pending the Canadian court's opportunity to make a fulsome custody determination. The experts testifying on behalf of Respondent focused on the psychological harm of living with Petitioner. As explained by the Ninth Circuit, "the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in the home jurisdiction, [thus] the grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future." Gaudin v. Remis, 415 F.3d 1028, 1037 (9th Cir. 2005).

Thus, the court's task now is to determine how to maintain L.E.W.'s safety from grave risk pending the Canadian court's opportunity to conduct its proceedings. In closing arguments and in post-trial briefing, the court asked both parties to propose undertakings that would ensure L.E.W.'s safety if he were ordered to be returned. The undertakings proposed by the parties were strikingly similar. The parties both propose that Petitioner

should assist Respondent in returning to Canada without fear of criminal apprehension, and that the 2012 custody order should be in force pending further order of the Canadian court. The court agrees with the parties that L.E.W.'s safety can be ensured, and the purpose of the Hague Convention fulfilled, if the 2012 custody order is restored as the operating order and Respondent can return to Canada with L.E.W. in his custody so that he may participate in the Canadian custody determination.

Similar to the circumstances at issue in Sabogal v. Velarde, 106 F. Supp. 3d 689, 710 (D. Md. 2015), the court has been made aware that there is a criminal investigation and possible charge against Respondent for leaving Canada with L.E.W. without Petitioner's consent and against the court's order. No order of this court can supersede the existing November and December 2017 custody orders from the Canadian court or prevent criminal charges from proceeding in Canada against Respondent. However, if working together with the Canadian authorities, the parties can arrange to (1) have the temporary and final custody orders entered on November 22, 2017 and December 21, 2017 vacated, so that the underlying September 26, 2012 joint custody order is reinstated, and (2) arrange to have the criminal charges against Respondent dismissed or the investigation closed, the legal landscape would return to the status quo at the time of the removal. Then Respondent can take the child back to Ontario for custody proceedings. The court will direct the parties to make arrangements to fulfill these undertakings within sixty (60) days. Counsel for both parties shall submit affidavits or schedule a status conference to report on these arrangements at the end of the sixty (60) day time period.

If these undertakings are met, the court will order the return of L.E.W. to Canada by Respondent and at Respondent's expense. Pending the resumption of the Canadian custody proceedings, the parties shall be governed by the September 26, 2012 final custody order. Neither party shall remove L.E.W. from the Niagara Region, Ontario, Canada without an express order of the Canadian court permitting L.E.W.'s removal. The court's sealed agreed-to order entered March 15, 2018 also will remain in effect pending the resolution of this action. The court further shall require the parties to transmit forthwith the full record (sealed and unsealed) of this evidentiary hearing, including all pleadings, orders, reports, and transcripts,[18] to the Canadian court presiding over the custody proceeding, FACS Niagara, and The Canadian Children's Lawyer. As agreed to by the parties at the evidentiary hearing, the parties shall split the cost of ordering the transcripts.

The parties requested additional undertakings. Respondent requested that Petitioner release drug tests, treatment records, and medical records to the court at a status conference and require the drug tests to be clean. The court already has seen years of drug test results and has come to the conclusion that Petitioner has a serious drug abuse problem. Further drug-testing records will not change the court's findings. Rather, the court will accept Petitioner's proposed undertaking that neither party take drugs for which they do not have a current prescription. Respondent also requested that Petitioner submit a line-item financial budget to demonstrate financial support. The court considers this information not relevant to its determination of grave risk and will not order this undertaking.

---

[18] The court has retained custody over journals at issue in this action without admitting them into evidence. The court will maintain custody over the journals pending resolution of this action, which should provide ample time for the Canadian court to request the journal entries if needed for the custody proceeding. If no such request has been made, then the journals will be returned to their owner.

If these conditions are met, L.E.W. would be placed in an environment that has been previously shown to be safe, and the case would return to the status quo at the time of the wrongful removal. Although this arrangement does require some action to undo what Respondent has wrought, it would advance international comity to a much greater degree than the alternative, which is to deny the Petition outright.

## V. FEES AND COSTS

The Hague Convention and its enabling legislation require a court to order the respondent to pay the petitioner's necessary expenses if the court orders the return of the child, unless such an award would be "clearly inappropriate." Hague Convention, art. 26; 22 U.S.C. § 9007; 22 U.S.C. § 9007(b)(3). With respect to the award of attorney's fees and costs, ICARA provides:

> Any Court ordering the return of a child pursuant to an action brought under section 9003 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such an award would be clearly inappropriate.

22 U.S.C. § 9007(b)(3).

Under the Hague Convention, an award of fees and costs serves two purposes: (1) "to restore the applicant to the financial position he or she would have been in had there been no removal or retention," and (2) "to deter such removal or retention." Hague Convention; Text and Legal Analysis, 51 Fed. Reg. 10494–01, 10511 (Mar. 26, 1986). A party seeking an award of attorney's fees must submit adequate evidence detailing the hours worked and his or her rates. See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

Petitioner seeks reasonable and necessary expenses, including attorney's fees, suit money, expenses, and costs. See Verified Pet. for Return of Child to Canada, ECF No. 1, at 23. "[T]he respondent in a return action has the opportunity to show why an award of necessary expenses to a prevailing petitioner would be clearly inappropriate." Darin, 746 F.3d at 19–20; see also Whallon v. Lynn, 356 F.3d 138, 140 (1st Cir. 2004) (finding the respondent has the burden to establish that a fee or expense order would be clearly inappropriate).

Petitioner has the opportunity to submit any evidence of her reasonable and necessary expenses, including evidence of attorney's hours and rates, within sixty (60) days of the entry of this order. See Hensley, 461 U.S. at 433 (requiring requests for attorney's fees to include adequate evidence detailing hours worked and his or her rates). If Petitioner submits such evidence, Respondent will have thirty (30) days to respond to the request, and provide any argument as to why an award of necessary expenses would be inappropriate under these circumstances. Cf. E. Sussex Children Servs. v. Morris, 919 F. Supp. 2d 721, 734 (N.D.W. Va. 2013) ("[G]iven the Respondents' financial conditions, they would be entirely unable to pay such an award. Thus, it would be clearly inappropriate to grant an award of attorneys fees and costs as Petitioner has not presented adequate evidence to substantiate such a request and Respondents would be unable to pay any amount of an award."). Petitioner may file any reply within fourteen (14) days of Respondent's filing.

## VI. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that Petitioner Tammy Mae Wertz's Verified Petition for Return of Child to Canada (ECF No. 1) is

**CONDITIONALLY GRANTED.** The court will order the return of L.E.W. to Canada, provided the parties provide proof within sixty (60) days that the following conditions, which would reinstate the status quo at the time of the wrongful removal, have been satisfied:

1. That this custody dispute be resubmitted to the Canadian courts, and a hearing scheduled.

2. That the parties agree to ask the Canadian court to vacate the November 22, 2017 and December 21, 2017 custody orders, and reinstate the September 26, 2012 order pending a further hearing.

3. That the parties take all steps necessary to have dismissed or closed any pending criminal complaints, investigations, or charges in Canada against Respondent, relating to his removal of the child.

4. That, once L.E.W. is returned to Canada by Respondent, the parties agree that neither party shall remove him from the Niagara Region, Ontario, Canada without an express order of the Canadian court permitting L.E.W.'s removal.

5. That the parties agree that neither party shall take any drugs for which they do not have current prescriptions.

6. That the parties transmit forthwith the full record (sealed and unsealed) of this evidentiary hearing, including all pleadings, orders, reports, and transcripts, to the Canadian court presiding over the custody proceeding, FACS Niagara, and the Canadian Children's Lawyer. The parties shall share the expense of ordering the transcripts.

Upon proof that these conditions are satisfied, the court will issue a final order certifying that the conditions have been met, mandating compliance with the listed undertakings, and ordering the return of L.E.W. to Canada.

It is **FURTHER ORDERED** that Petitioner is permitted sixty (60) days to file an application for attorneys' fees and expenses, Respondent shall have thirty (30) days to respond, and Petitioner may file any reply within fourteen (14) days.

An appropriate Order will be entered this day.

Entered: 03 - 30 - 2018

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge